FILED'10 MAY 13 15:18USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARK R. ROGAN,

     Plaintiff,          CV-09-6078-SU

  v.               OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of Social
Security,

      Defendant.

SULLIVAN, Magistrate Judge:

   Plaintiff Mark Rogan brings this action for judicial review of a final decision of the

Commissioner of Social Security denying his applications for disability insurance benefits (DIB)

under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C.

§ 405(g). The Commissioner's decision is affirmed.[1]

---

  [1] The parties have consented to jurisdiction over this matter by the magistrate judge
pursuant to 28 USC 636(c).

1 - OPINION AND ORDER

## BACKGROUND

Rogan was forty-five years old at the time of the administrative hearing. Admin. R. 419.[2] He earned a high school diploma. *Id.* Rogan worked as a station manager for a trucking delivery service and also as a cargo handler and driver for the same company. He quit this job in October, 2002, to pursue buying, renovating, and reselling houses with his wife. *Id.* at 419-420. Rogan states neck surgery he had in September, 2002, would have prevented him from continuing his station manager job. *Id.* He alleges disability due to neck, back, and right leg pain, depression, and the side effects of pain medications. Rogan filed for disability on April 21, 2004, alleging onset of disability from November 1, 2002. His application was denied initially and on reconsideration. A hearing was held before an Administrative Law Judge (ALJ) on December 8, 2006. The ALJ found Rogan satisfied the insured status requirements for a claim under Title II through December 31, 2007. Rogan must establish that he was disabled on or before that date to prevail on his disability insurance benefits claim. 42 U.S.C. § 423(a)(1)(A). *See Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998). The ALJ issued an opinion on March 30, 2007, finding Rogan not disabled, which is the final decision of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala,* 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12

---

[2] Citations to "Admin. R." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

months. . . ." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. 20 C.F.R. §404.1520. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity (SGA) since the alleged onset of disability. 20 C.F.R. §404.1520(b). If the claimant has engaged in SGA, he is not disabled. *Id.* If the claimant has not engaged in SGA, the analysis proceeds. The Commissioner determines at step two whether the claimant has a severe impairment. An impairment is severe if it significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §404.1521. The burden to show a medically determinable severe impairment is on the claimant. *Bowen v. Yuckert*, 482 U.S. at 146. At step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Id.* at 141; 20 C.F.R. §404.1520(d). The criteria for these listed impairments are enumerated in 20 C.F.R. pt. 404, subpt. P, app. 1. (Listing of Impairments).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. §404.1545, Social Security Ruling (SSR) 96-8p. At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past. If the ALJ determines that he retains the ability to perform his past work, the Commissioner will find the claimant not disabled. 20 C.F.R. §404.1520(f).

If the claimant cannot perform his past relevant work, the analysis proceeds to step five. At step five, the Commissioner must determine whether the claimant can perform work that exists in the national economy. *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R. §404.1520(g). Here the burden of production shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. *Id.*, 20 C.F.R. §404.1566.

## ALJ'S FINDINGS

The ALJ applied the five step disability determination analysis and found at step one that Rogan had not engaged in any substantial gainful activity since November 1, 2002. Admin. R. 15. At step two, he determined that Rogan has the medically severe impairments of degenerative disc disease of both the cervical and lumbar spine, with a history of herniated disc at C4-5 status post surgery for discectomy and fusion in September, 2002, and herniated disc at C3-4; and history of bilateral knee arthroscopic surgeries. *Id.* The ALJ found at step three that Rogan did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app.1. *Id.* at 21.

At step four, the ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally. He can perform a combination of sitting, standing, and walking to complete an eight-hour workday but with sitting limited to one-half hour at a time; standing limited to one-half hour at a time; and walking limited to one-half mile at a time. The claimant can occasionally stoop, crouch, crawl, and reach overhead but cannot climb ladders. He must avoid dangerous hazards and has difficulty with repetitively looking up. In addition, the claimant is unable to consistently follow detailed instructions.

*Id.* at 21. At step four, the ALJ found Rogan could not perform his past relevant work as a station

manager, which included heavy work. *Id.* at 22. The ALJ found that Rogan has limitations on

his ability to perform all light work. Therefore, pursuant to step five, the ALJ solicited the

testimony of a vocational expert (VE). The VE testified there were several jobs in the national

economy an individual with Rogan's same age, education, past relevant work, and RFC could

perform. *Id.* at 445-446. Based on the VE's testimony the ALJ found there were significant jobs

in the national economy that Rogan could perform. The ALJ found that claimant had not been

under a disability, as defined in the Social Security Act, from November 1, 2002, through the date

of the ALJ's decision. *Id.* at 25.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record as a whole. *Batson*

*v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence

means . . . such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for "determining credibility, resolving conflicts in the medical

testimony and resolving ambiguities." *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir.

2001)(citations omitted). The court must weigh all of the evidence, whether it supports or detracts

from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). If the

evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the

court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of*

*Soc. Sec. Admin.*, 359 F.3d at 1193.

## DISCUSSION

Rogan challenges the ALJ's determination of his residual functional capacity by alleging the ALJ improperly assessed the medical evidence and his credibility. Rogan also asserts the ALJ erred at step five by not including all of his limitations in the hypothetical questions given the VE.

### I.   Medical Background

Rogan visited Dr. Byrne, his primary care practitioner, on January 31, 2002, to follow up on his right elbow epicondylitis (tennis elbow). Admin. R. 205. His treatment provided little relief and Dr. Byrne referred Rogan to a physician in rehabilitation medicine, Dr. Weller. Dr. Weller saw Rogan on February 28, 2002, and noted Rogan had right arm pain with activity since sanding hardwood floors, and intermittent left neck pain. *Id.* at 134. She noted Rogan took Ambien for sleep and Hydrocodone for pain. The exam was mostly normal except Rogan had limited range of motion (ROM) in his left cervical spine and muscle weakness on the right side. Dr. Weller ordered an MRI and recommended continuing physical therapy (PT). *Id.* at 137.

Dr. Weller saw Rogan on March 15, 2002, and noted the MRI showed a right disc protrusion at C4-5 with impingement of the cord. *Id.* at 133. There was a broad based bulge without impingement at C5-6. She recommended PT with a trial of cervical traction, an exercise program, and a referral for a right C6 nerve block. On March 27, 2002, Rogan had the nerve root block at C6. *Id.* at 138. Dr. Weller examined Rogan on April 22, 2002, and noted while the nerve root block injection initially increased his right neck pain and numbness in his right forearm and hand, the pain improved. *Id.* at 131. Dr. Weller also noted that Rogan had not gone to PT and missed follow up appointments. However, Dr. Weller noted Rogan only had minor pain with

6 - OPINION AND ORDER

use of the right arm, some residual numbness, full cervical ROM and nearly normal strength. She diagnosed right forearm strain with myofascial pain, C4-5 disc herniation shown on an MRI, and recommended continued PT with a trial of cervical traction.

Dr. Byrne saw Rogan on July 22, 2002, for left elbow pain, noted his exam was within normal limits, and ordered a trigger point injection for his left lateral epicondylitis. *Id.* at 203. Rogan was evaluated by Dr. Kokkino, a neurosurgeon, on August 6, 2002. *Id.* at 166-169. Dr. Kokkino was unable to view Rogan's most recent MRI but did so on August 8, 2002. *Id.* at 165. He told Rogan the MRI showed a C4-5 disc protrusion with spinal cord displacement on the right. He further noted this was paradoxical as Rogan's subjective symptoms were on his left. *Id.* Dr. Kokkino discussed this with Rogan and explained a discectomy and fusion should take care of right sided pain, but would not necessarily do anything about his left sided pain.

Dr. Kokkino performed a C4-5 anterior discectomy and fusion on Rogan on September 17, 2002. *Id.* at 152-154, 163. At the six week follow up appointment on October 30, 2002, Dr. Kokkino noted full motor strength in the upper extremity, some numbness in the left arm, and allowed an increase in work activity. *Id.* at 162. On December 12, 2002, Dr. Kokkino noted Rogan had some neck pain while painting, but no radicular symptoms, no evidence of myelopathy, and full strength in his extremities. *Id.* at 161. Dr. Kokkino examined Rogan on January 7, 2003, because of pain symptoms and headaches, although they were not severe enough to preclude him from work. *Id.* at 160. Dr. Kokkino noted Rogan had excellent range of motion, full strength in all extremities, and no paracervical tightness. He diagnosed a viral syndrome as cervical symptoms should have resolved, but ordered x-rays of the cervical spine. The x-rays showed the fusion at C4-5 was intact and showed degenerative changes at C5-6. *Id.* at 172.

7 - OPINION AND ORDER

Dr. Kokkino examined Rogan on February 11, 2003, and noted complaints of central neck pain which were exacerbated by activities at work, especially ceiling work, and by a fall during a recent ski trip. *Id.* at 159. Dr. Kokkino found Rogan was neurologically intact and the fusion site was stable. He ordered a CT scan of the cervical spine. On March 17, 2003, Dr. Kokkino examined Rogan, noting he complained of increased central neck pain as he worked during the day. *Id.* at 158. He found Rogan to be neurologically intact and noted the CT scan showed an excellent fusion. Dr. Kokkino diagnosed the pain as primarily muscular, and recommended PT with traction. He prescribed Celebrex to see if he could get Rogan off of Vicodin. On May, 19, 2003, Dr. Kokkino examined Rogan, noting he continued to complain of increased central neck pain with work, but had no radicular symptoms. *Id.* at 157. Dr. Kokkino recommended continuation of home exercises given by the physical therapist and referred Rogan to Dr. Morgan, a pain specialist, to help Rogan get off of the amount of Vicodin he was taking.

Dr. Morgan, a pain specialist, examined Rogan on May 30, 2003. *Id.* at 282-286. She noted he had axial neck pain following his fusion surgery which was exacerbated by activity, especially working with his hands over his head while painting. *Id* at 286. Dr. Morgan noted Rogan worked full time as a painter and that he also had complaints of low energy, headaches, and anxiety. She recommended a long acting opioid medication, steroid injections, and decreasing Vicodin. On June 13, 2003, Dr. Morgan gave Rogan a right sided facet block on C5-6. *Id.* at 279-281. Dr. Morgan noted in August that Rogan's neck pain was improved and he was sleeping somewhat better. *Id.* at 277-278. She switched him from MS Contin to Methadone because of the sedative effect of MS Contin.

Rogan saw his primary care physician on September 6, 2003, for a stiff neck and reported being in a minor motor vehicle accident the previous day. *Id.* at 200. He was noted to have full ROM and no neurological defects. X-rays showed no acute pathology, some C5-6 encroachment on neural foramen, and an anatomically aligned fusion. *Id.* at 229. Dr. Morgan noted on September 18, 2003, that the Methadone was having sedating effects, Rogan was working full time as a painter, and had complaints of anxiety and depression. *Id.* at 275-276. She noted in October that he was not sleeping well and feeling tired, but was also working fourteen hours a day doing physical labor. *Id.* at 274. Dr. Morgan offered the option of intrathecal drug administration as the oral pain medications seemed unable to control his pain. *Id.* at 273. Rogan saw his primary care physician in November for anxiety and depression and was switched from Wellbutrin to Zoloft. *Id.* at 198-199.

Dr. Morgan examined Rogan on December18, 2003, and noted neck stiffness following a neck "lock up" which was resolved, increased Methadone tolerance, and no depression or anxiety. *Id.* at 269, 271. Dr. Byrne saw Rogan in December and January and noted he was not as jittery with Zoloft, no longer needed Xanax for anxiety, and that his depression and anxiety were controlled with medications. *Id.* at 197-198. Dr. Hacker, a neurosurgeon, examined Rogan on February 2, 2004. *Id.* at 187-189. He noted the exam was generally within normal limits and the cervical pain was of uncertain etiology. Dr. Hacker noted Rogan was only able to paint or do other vigorous activities for up to a couple of hours at a time. He referred Rogan to Dr. Karaseck for a cervical discogram.

Dr. Karaseck examined Rogan on February 28, 2004, and noted the surgery had markedly reduced his arm symptoms but he still had right sided neck pain that worsened with activity and

limited his work and recreation activities.  *Id.*  at 182-183.  He noted full motor strength in the upper extremities, tenderness over the facets on the right side, and unremarkable reflexes and sensations.  Dr.  Karaseck recommended a cervical discography.  On  April 2, 2004, Dr.  Karaseck noted Rogan had neck pain symptoms since his motor vehicle accident.  *Id.*  at 175.  He noted a new MRI showed a new disc protrusion at C3-4.

Dr.  Hacker noted in April that the car insurance company did not want to pay for diagnosis or treatment of Rogan's new neck problem as it was a very minor accident.  *Id.*  at 181.  On May 5, 2004, Dr.  Hacker noted that prior to the accident in the fall of 2003 Rogan had predominantly right sided symptoms following his surgery.  *Id.*  at 180.  Following the accident, Rogan's symptoms worsened and added left sided symptoms.  Dr.  Hacker noted the MRI indicated a right lateral disc herniation at C3-4 and cervical spondylosis at C5-6.  He recommended avoiding another fusion and trying pain management and rehabilitation therapy.

Dr.  Morgan noted on May 11, 2004, Rogan still had pain with an increased dosage of Methadone.  *Id.*  at 262-264.  She noted he was unable to get his discogram due to insurance issues.  Dr.  Morgan also noted no excessive pain behaviors, Rogan was still working full time as a painter, and again increased his dosage of Methadone.  In June, Dr.  Morgan noted Rogan had an onset of numbness in the lateral right thigh when lying down, headaches, and felt four Vicodin a day was not sufficient.  *Id.*  at 257-261.  She changed his medication to Oxycodone for break through pain.  Dr.  Morgan noted on August 2, 2004, Rogan continued to have pain in his low back and right thigh despite an increase in Methadone.  *Id.*  at 253-256.  She noted his MRI of the lumbar spine showed a small left L4-5 foraminal bulge without herniation or impingement of the nerve root or spinal canal.  Dr.  Morgan gave Rogan trigger point injections for his pain in the

right occipital area on August 16, 2004, and a transforaminal epidural steroid injection at L4 on

August 20, 2004.  *Id.*  at 245-247, 249-252.

Dr.  Morgan noted in September the epidural steroid injections provided significant relief

from Rogan's low back and leg pain and discussed facet block injection therapy.  *Id.*  at 242-244.

She performed a C5-6 facet block on September 27, 2004.  *Id.*  238-241.  On January 12, 2005,

Dr. Morgan switched Rogan back to Vicodin from Oxycodone for break through pain.  *Id.*  at 366-

369.  She noted Rogan was still working full time as a painter.  Dr.  Morgan gave Rogan another

epidural steroid injection to the right L5 on January 14, 2005.  *Id.*  at 365.

Dr.  Byrne noted on January 27, 2005, that Rogan's depression was improved with a

switch from Zoloft to Prozac.  *Id.*  at 378.  She noted he continued to have episodes of panic while

driving.  Previous tests showed no cardiology component.  *Id.*  at 176-177.  In February, 2005,

Rogan experienced medication side effects of sweats, heartburn, dizziness, and fatigue.  His

medications were temporarily reduced  *Id.*  at  355-357, 361-363.  Dr.  Lockfeld, a neurosurgeon,

examined Rogan in April and May of 2005.  *Id.*  at 313-317.  He noted Rogan complained of

memory difficulty, depression, pain, and poor sleep.  His physical exam was within normal limits,

his MRI brain scan, EEG, and lab testing were all normal.  Dr.  Lockfeld suspected Rogan's

dizziness could be panic attacks and recommended switching from Prozac to Paxil with a trial of

Xanax.

Dr.  Morgan noted on May 19, 2005, Rogan had no episodes of dizziness since starting

Xanax.  *Id.*  at 350.  She noted Rogan was working occasionally as a painter and was leaving for

Canada for two months.  Dr.  Morgan noted on August 17, 2005, Rogan had headaches once a

month with no benefit from migraine medications.  *Id.*  at 346-349.  She noted Rogan complained

11 - OPINION AND ORDER

of depression but denied anxiety. She recommended follow up with Dr. Lockfeld for headaches,
Dr. Byrne for depression, and a trial of Midrin for headaches. On August 29, 2005, Dr. Byrne
noted high blood pressure, which could be associated with Rogan's headaches, lessened anxiety
but continued depression about pain, headaches caused by neck pain twice a week, and migraines
a few times a month. *Id.* at 376. She recommended blood pressure medication and increased
dosage of Prozac. On September 19, 2005, Dr. Byrne noted no headaches or migraines since
starting blood pressure medication. *Id.* at 375. She also noted a decrease in the use of Xanax and
despite a minor increase in back pain, Rogan decided to see if it got better without treatment.

On November 23, 2005, Dr. Morgan noted the Midrin prescription had significantly
helped Rogan's headaches, and the lumbar epidural steroid injection given in October had helped
his radicular pain. *Id.* 341-345. She noted Rogan was going to Hawaii for a couple of weeks and
could take Xanax for flying anxiety. Dr. Morgan noted on February 9, 2006, that Rogan was
willing to repeat epidural steroid injections, but he was not willing to use intrathecal medication
administered with an implanted pump. *Id.* at 337-340. Rogan received trigger point injections
in the neck muscles in February and March and an epidural steroid injection on the right L4 facet
in April. *Id.* at 331-336. On May 1, 2006, Dr. Morgan noted lumbar spine pain and leg
numbness exacerbated by mowing the lawn. *Id.* 327-330. She recommended a new MRI of the
lumbar spine, a discogram and further epidural steroid injections. On May 25, 2006, Dr. Morgan
noted the recent MRI showed no significant change from 2004. *Id.* at 323A-325. She noted
worsened back pain, and no depression or anxiety.

On November 12, 2006, Dr. Morgan wrote a letter to Rogan's attorney. *Id.* at 407-408.
She stated she did not impose any work limitations on Rogan other than to avoid self-defined pain

causing activities.  *Id.* at 407.  Dr.  Morgan noted Rogan was limited in sitting, standing, and

walking for long periods of time due to pain in his neck and low back.  She noted he could lift ten

to fifteen pounds comfortably and could not lift over forty pounds without risk of greater injury.

Dr.  Morgan stated Rogan never said he needed to lie down or recline several times a day.  She

further noted his medication regimen was potentially sedating and may impair the ability to focus,

concentrate and remember.  Dr.  Morgan stated Rogan's cervical and lumbar disease with

headaches could have a chain reaction - pain in one area exacerbating pain in another.  She stated

whether the pain was incapacitating was subjective and unpredictable.  Dr.  Morgan noted that on

a bad day, Rogan might miss appointments, lay down, and do little else.  She noted at last report

he was having more good days than bad, but it may be due to pain medications which cause some

cognitive side effects.  Dr.  Morgan supported Rogan's statement that he has bad days one to two

times per week as consistent with what he reported to her and with what she has seen.  *Id.* at 408.

On November 30, 2006, Dr.  Byrne wrote a letter to Rogan's attorney stating that Xanax

can have sedating effects and decrease the ability to focus, concentrate, and remember.  *Id.* at

414-415.  She noted Prozac and the sleeping medication Ambien should not impose any

limitations during the workday.

## II.   Residual Functional Capacity

Rogan asserts the ALJ erred in determining his RFC by failing to properly assess the

medical evidence.  Rogan also contends the ALJ erred in discounting his credibility.

### A. Medical Evidence

Rogan alleges the ALJ improperly discounted the opinion of Dr.  Morgan, his treating pain

specialist, contained in a letter to his attorney.  Social security regulations specify that the most

weight is given to the opinions of treating physicians, followed by examining physicians, and the least amount of weight is given to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). An ALJ may reject the opinion of a treating physician if it is controverted by other treating or examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citations omitted). The ALJ may reject an uncontroverted opinion by clear and convincing reasons. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). The ALJ may also reject physician opinions, whether or not controverted, when they are brief, conclusory and not supported by clinical findings. *Thomas v. Barnhart*, 278 F.3d at 957, *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F. 3d 1190, 1195 (9th Cir. 2004). An ALJ may also reject physician opinions that rely primarily on a claimant's subjective complaints which are properly discounted. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989).

The ALJ noted Dr. Morgan's opinion supporting Rogan's statement that he had one or two bad days a week where he needed to lay down most of the day was based largely on Rogan's subjective reports and self-imposed limitations. Admin. R. 23. Dr. Morgan noted she had not imposed any restrictions on Rogan other than to avoid activities that caused pain. *Id.* at 23, 407. The ALJ found Dr. Morgan's opinion that Rogan is limited in his ability to lift and his ability to sit, stand, or walk for long periods of time to be supported by the record, and he incorporated restrictions into Rogan's RFC. *Id.* at 23. However, he noted Dr. Morgan did not find in her medical records any reports of Rogan's need to lie down several times a day. *Id.* Dr. Morgan does not give an opinion regarding the need to lie down several times a day. *Id.* at 407. The ALJ

also found Dr. Morgan's support of Rogan's statement that he had one or two days a week where he was unable to do anything but lie down unsupported by the record as a whole. *Id.* at 23.

The ALJ correctly noted the medical record does not support this level of weekly disability. The notes from the physicians who examined Rogan do not mention a need to lay down all day, once or twice a week, and the objective findings of MRIs, x-rays, and clinical examination do not support this level of disability. *Id.* at 17, 186, 189, 257-260, 316-317, 323A-325, 383. The ALJ also noted Dr. Hacker's notes state Rogan was able to do vigorous activities for a few hours at a time. *Id.* at 18, 188-189.

In addition, the ALJ noted Dr. Morgan's notes state Rogan worked full time as a painter in 2003, 2004, 2005, with subsequent occasional work as a painter. *Id.* at 18, 159, 262, 286, 337, 347, 366. Dr. Morgan also noted in October, 2003, Rogan was working fourteen hours a day doing physical labor. *Id.* at 18, 274. The ALJ further noted Rogan's stated daily activities were inconsistent with the inability to do anything one or two days a week. *Id.* at 18, 111-118. He noted these activities included household chores, cooking, shopping, vacuuming, driving, laundry, and general money management. *Id.* at 16, 18, 19,111-118. This level of activity is inconsistent with Dr. Morgan's opinion and a legitimate factor for the ALJ to consider in determining the proper weight to afford Dr. Morgan's opinion. *Morgan v. Commissioner of Soc. Sec. Admin.*, 169 F. 3d. 595, 601-602 (9th Cir. 1999), *See, Valentine v. Commissioner of Soc. Sec. Admin.,* 574 F3d. 685, 692 (9th Cir. 2009) (Physician's opinion of unemployability when physician also acknowledged that the claimant was able to work full time a relevant factor in rejecting physician's opinion).

The ALJ also reviewed the opinions of the state agency medical consultants regarding Rogan's abilities. *Id.* at 19, 287-294. While generally agreeing with their findings regarding Rogan's ability to lift, reach and perform postural activities, the ALJ found the longitudinal record supported limits on Rogan's ability to sit, stand or walk. *Id.* at 19. The Commissioner relies on medical and psychological consultants to make findings of fact about the nature of a claimant's impairments and the severity of the functional limitations they impose. 20 C.F.R. § 404.1527(f); SSR 96-6p. However, these reviewing sources do not treat or examine the claimant. The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995). It may, however, as in this case, constitute substantial evidence when it is consistent with other evidence in the record. *Id., Andrews v. Shalala,* 53 F.3d at 1041.

The ALJ did not err in rejecting the opinion of Dr. Morgan regarding Rogan's one or two bad days a week. It is the ALJ's duty to resolve ambiguities in the record. *Edlund v. Massanari,* 253 F.3d at 1156. The ALJ was able to properly evaluate the evidence and resolve the ambiguities in the record. As noted above, the ALJ correctly found Dr. Morgan's conclusory statement to be based primarily on Rogan's subjective complaints, which he properly discounted (see below, II. B.). He found her statement inconsistent with her own medical notes regarding Rogan's level of work activity, and inconsistent with the record as a whole. The ALJ provided sufficient reasons based on substantial evidence for discounting Dr. Morgan's opinion regarding Rogan's two bad days a week. *Tonapetyan v. Halter,* 242 F.3d 1144, 1149-1150 (9th Cir. 2001), *Magallanes v. Bowen,* 881 F.2d at 751.

Rogan asserts the ALJ did not properly assess the opinion of Dr. Byrne regarding his mental limitations. Dr. Byrne, Rogan's primary care physician, wrote a letter to Rogan's attorney stating she treated him for depression and that one of his medications, Xanax, could have potentially sedating effects and decrease the ability to focus, concentrate, and remember. Admin. R. 414-415. She did not state any level of functional limitations imposed by these medication side effects and Rogan's depression. Dr. Byrne also noted that depression and chronic pain were interlinked. The ALJ reviewed this letter as well as Dr. Byrne's records and other medical records regarding treatment. *Id.* at 19, 21, 197, 324, 378. He found at step two that Rogan's depression was not a severe impairment. He found Rogan's depression was managed with medication and resulted in only mild limits in functioning. *Id.* at 21.

Rogan asserts the ALJ improperly gave a "lay opinion" that Rogan's memory problems, confusion and diminished concentration were attributable only to medication side effects. To the contrary, the ALJ acknowledged these symptoms could be due to medication side effects "and/or depression." *Id.* at 19, 21. He cites the record, including hearing testimony, which attributes these symptoms to side effects of medications. *Id.* at 19, 407, 425, 440. The ALJ also considered the opinion of the state agency consultants that Rogan's depression resulted in no significant limitations in his functioning. *Id.* at 22, 23. The issue for the ALJ to consider was whether there were significant functional limitations due to depression and side effects. The ALJ properly considered the evidence regarding Rogan's depression and medication side effects and incorporated an " inability to consistently follow detailed instructions" into Rogan's RFC. *Id.* at 22.

Finally, Rogan asserts the ALJ failed to properly consider Rogan's medication regime, injection therapies, and headaches. However, the ALJ considered all of these issues, and incorporated appropriate limits into Rogan's RFC. *Id.* at 18, 19, 20, 22, 23. The court must uphold the ALJ's findings, even if evidence exists to support more than one rational interpretation of the evidence. *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d at 1193; *Andrews v. Shalala,* 53 F.3d at 1039-1040.

### B. Rogan's Testimony

The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms. *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir. 1996). Rogan has a medically determinable impairment which could produce his symptoms. When there is an underlying impairment and no evidence of malingering, an ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of his symptoms. *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir. 1993). The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1995).

When making a credibility evaluation, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen v. Chater,* 80 F.3d at 1284-1285. The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Id.*

In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p.

The ALJ found Rogan's physical impairments limited his functioning capacity and could reasonably result in pain symptoms. *Id.* at 17. However, the ALJ found the extent of the limitations claimed by Rogan not to be consistent with the medical record or the record as a whole. *Id.* at 18, 19, 22, 23. The ALJ noted the objective medical records showed impairments but not of a severity that would preclude all work. He noted Rogan's cervical MRI in 2004 showed excellent alignment of the C4-5 fusion, minor spondylosis at C5-6, and a right lateral disc herniation at C3-4 with no evidence of spinal stenosis or cord compression. *Id.* at 17, 186. An MRI of the lower back in 2006 showed no significant changes from the MRI of 2004, minimal left disc bulging at L4-5, no disc herniation, no spinal stenosis, no foraminal stenosis and only minimal disc space narrowing. *Id.* at 17, 383.

The ALJ also found Rogan's assertion of disability from November 1, 2002, was undermined by the record indicating full time painting work in 2003, 2004, and part of 2005, with subsequent work as a painter. *Id.* at 18, 159, 249, 258, 286, 350, 366. In addition, he noted the record indicated working fourteen hours a day at physical labor in 2003, and reporting to his neurosurgeon he was only able to do painting or "vigorous" activities for a couple of hours at a time. *Id.* at 18, 188, 274. Rogan's wife testified he painted and did clean up chores for their business. *Id.* at 436-438. She testified that although he was "competitive" at first, his ability to continue doing overhead work and other strenuous activity decreased over time. *Id.* A claimant's

work history may be considered as a factor in evaluating credibility. *Thomas v. Barnhart,* 278 F.3d at 959.

The ALJ also found the level of daily activities reported by Rogan was inconsistent with an inability to do any work. The ALJ noted Rogan stated in his 2004 disability application that he performed a variety of activities. *Id.* at 18. Rogan stated he cooked for his family; took care of the family pets; vacuumed; washed walls; wiped appliances; shopped for food and household goods; paid bills; did laundry; did some watering, weeding, pruning for limited periods of time; and socialized with friends once a week. *Id.* at 111-118. Although Rogan testified his activity level had decreased over time, he reported doing cooking, vacuuming, laundry, dishes, and running errands for his wife. *Id.* at 426.

The ALJ considered the medical record, Rogan's work history, and daily activities and concluded the allegations of Rogan regarding the limiting effects of his symptoms were not supported. He found Rogan had functional and pain limitations which prevented him from sustaining strenuous and demanding activities, but did not prevent him from doing any work, particularly those within his capacity. *Id.* at 19. The ALJ considered appropriate factors and drew reasonable inferences from substantial evidence in the record in assessing Rogan's credibility.

The ALJ properly assessed Rogan's residual functional capacity. He evaluated the medical evidence and reached conclusions based on substantial evidence in the record. The ALJ assessed credibility and drew reasonable inferences regarding credibility. The ALJ's determination of Rogan's RFC is supported by substantial evidence in the record and free of legal error. The ALJ's

RFC decision is therefore upheld. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193;

*Andrews v. Shalala*, 53 F.3d at 1039-1040.

**III.    Vocational Analysis - Step Five**

At step five, the Commissioner must show that significant numbers of jobs exist which the

claimant can perform. *Andrews v. Shalala*, 53 F.3d at 1043. An ALJ can satisfy this burden by

eliciting the testimony of a vocational expert ("VE") with a hypothetical question that sets forth

all the limitations of the claimant supported by the record. *Id.; Osenbrock v. Apfel*, 240 F.3d

1157, 1162-1163 (9th Cir. 2001).

Rogan contends the ALJ erred at step five because he elicited testimony from the VE with

hypothetical questions that did not contain the limitations regarding absenteeism, migraines, and

mental limitations. He asserts his pain level and need to miss work from bad days make him

unemployable. As described above, the ALJ did not find these limitations credible. The record

supports the ALJ finding that Rogan's migraine's were largely controlled by medications. In

addition, the ALJ properly found Rogan's assertion regarding one or two bad days a week

unsupported by the record. The ALJ did find mental limitations and included the inability to

follow detailed instructions into Rogan's RFC and two of the hypothetical questions given the VE.

*Id.* at 445-446. An ALJ is not required to incorporate limitations based on evidence that he

properly discounted. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1197; *Osenbrock

v. Apfel*, 240 F.3d at 1163-1165.

The ALJ considered all the evidence and framed his vocational hypothetical question

based on the limitations supported by the record as a whole. The VE testified that Rogan could

perform a significant number of jobs that exist in the national economy. Admin. R. 446. The

ALJ's conclusion that Rogan is able to perform some work and is not disabled is supported by substantial evidence and free of legal error.

## CONCLUSION

Based on the foregoing, the ALJ's decision that Rogan does not suffer from a disability within the meaning of the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision is AFFIRMED and the case is DISMISSED.

DATED this _10th_ day of _May_, 2010.


Patricia Sullivan

United States Magistrate Judge